Good morning, Your Honors. May it please the Court, Peter Ross with Hokidoki, appellant in the low-numbered case and respondent in the higher-numbered case. I'm going to address my appeal and then reserve my time to respond. Let me start out by saying, for 5,000 years, for all of recorded history, since the Great Flood, no one has ever used a heart-and-crossbone design. You certainly haven't proved that. It's extremely unlikely, and I think it's your weakest point. Well, that's the evidence from the case below. We all know how these cases go. I don't know that, not to be flipped, but, Counselor, you proved what you needed to prove and thought, but you did not go back and prove from the inception of time. The trial would have lasted a lot longer had you done so. So hyperbole, I think, is not the way to win your cases. Let me rephrase that. I was with Noah, and we would dispute that. Let me rephrase and say there was no evidence that anybody had ever used this design. And then in 2001, my client uses it. And the design is clearly fanciful. It has nothing to do with the clothing and accessories sold under that mark. It's just like using an Apple for a computer company. And yet, eight years after the design was created, the district court here determined that it was a weak mark because it was commonplace in the U.S. Did the cease and desist letters that you sent out, did those letters evidence whether those marks had been in use before Tokidoki started using it? Or were they affirmative evidence that they all started after? In other words, do the cease and desist letters establish, one way or the other, whether the recipients of those letters had started using them before you discovered they were using them and sent the letters? Could some of them have predated Tokidoki's use and therefore invalidated your opening statement? The cease and desist letters themselves don't establish that one way or another. However, during the over a year that discovery was pending in this case, of course, every defendant goes out and tries to find any prior use of the mark. And those 35 cease and desist letters are fertile ground. You know who these people are now. You just call them up and say, were you using this mark ahead of time? And do you have a single document that would help me establish that? And it's what every defendant does. And there is no evidence that came forward that anybody had used this mark before. So the district court then bases its conclusion that we have a weak mark solely on evidence that Tokidoki is out there policing its mark. Well, the law requires Tokidoki to police its mark. So in this case, you're damned if you do or damned if you don't. As I understand it, that's one prong of the required trademark infringement. But there also has to be infringement, meaning confusion. And that's where it seems to me that you have a real record problem. Well, the standard's likelihood of confusion. There doesn't have to be actual confusion. But I don't think we even have to get that far because the trial court here, which was the decider of fact, made a fundamental error. It decided that we had a weak mark. That's one of the most fundamental things that we have to look at in deciding whether there is a likelihood of confusion. And having made that fundamental error that we had a weak mark based solely on our cease and desist letters, we have to do this over. Of course, I don't think... I'm not understanding that. If you don't have any evidence of likely confusion, what difference does it make? Well, let me take that in a slightly different way. You don't have any evidence of likelihood of confusion, do you? Absolutely. Absolutely we do. In fact, this is a routine trademark case. Their mark looks exactly like our mark. Yes, but marks used on different products don't necessarily confuse. But we had it on shoes. We had it on shoes and apparel and other items as well. Didn't you have it on shoes after they had it on shoes? The evidence at trial, we believe, and it's cited in our brief, is that we had shoes out at the same time. For about a week or so. But they're in the market for months at the same time.  Well, in the junior's fashion market for women's apparel, people assume if you have the exact same mark on a shirt or shoes or other accessories that it's coming from the same company. Your view is if you had a distinctive mark, it wouldn't matter if you had no actual evidence of likelihood of confusion. You could just assume it. Well, it doesn't matter if you don't have evidence of actual confusion. Of likelihood of confusion. But you don't need any evidence. You can just look at the mark and say, oh, there's likelihood of confusion. You need to have evidence of likelihood of confusion. All right. So what's the evidence? The evidence is the marks looked almost exactly alike. They're in the same apparel fashion market. They're even used on the same products for a period of time. And that is what likelihood of confusion is all about. So is there a case law that says that that kind of, I guess you'd call it circumstantial evidence, is sufficient with no actual anybody testifying that there was likely confusion or actual confusion or anything like that? Because as I understand it, these were different, at least economic markets, because one was high end and one was low end in different stores and so on. So you need nothing else. That's enough. I don't know the answer to that, but is that your position? Well, AMF versus Sleepcraft goes back to its list of eight factors that we're supposed to use in every trademark case to determine whether there is a likelihood of confusion. And we just go through them one by one, and we have evidence on every point that one uses generally to establish likelihood of confusion. Even to the point where at trial there was actual confusion over who made the shoes that we were looking at, where the people had to look inside at the so-called sock label to make sure they came from the defendant. This was a routine trademark case where likelihood of confusion is established by the fact that they're used on very similar goods, that people usually buy their complementary goods. Counsel, you said the shoes. You used that at trial, your trial example. I'm sympathetic to that because I represented Louis Vuitton and won a TRO when the judge couldn't figure out the fakes from the originals. But they were all handbags, okay? And that's what Vuitton was suing on. In your case, as I understand the record, your usage was not on shoes except for what you, I think, acknowledge as a week's overlap. Is that what you're saying? Well, there was a week's overlap on shoes. Okay, so are you saying that if you have a week's overlap on shoes, and you came in with shoes with that mark after Fortune was using it on their shoes, correct? Yes. Okay, so they were there first, and then you came in and put your mark on your shoes, and it was an overlap for a week, and when you complained about it, they stopped. What I'm saying is something different. I'm just asking the facts. Yes. And so from that, looking at that sub-market, you're saying that that is enough to establish likelihood of confusion under sleep craft, or does the short duration weigh in the balance? I think it's absolutely enough, and I would analogize it to using Louis Vuitton on a belt or sunglasses. Well, that was my next question. I'm talking about shoes, okay? So they used it only on shoes. Yes. And you're saying, then, that Tokidoki had used the heart and crossbones on other fashion items. Yes. And those were, what, t-shirts? T-shirts. There was a long list of them. Well, give me six, then. Okay. At the time that Fortune did it. I don't want to misstate the record on it, so I'm not going to say with 100% assurity, but we were using t-shirts, certainly. There may have been sunglasses. Let me just point out that I don't want to try to decide this case on Louis Vuitton, but at the time of Louis Vuitton, there was no doubt that they were an established. They've been around for decades. So I'm focused on the facts of this case, because what you're saying is your mark became distinctive and could extend to a wide variety of fashion products based on the use of heart and crossbones on t-shirts. There's a whole jurisprudence, as I know you know, about you can't extend your mark willy-nilly by using it on one item and then claiming the universe. Levi's has spent a lot of money, and we have case law on that very area. Isn't that correct? Levi's had tried to extend from jeans to shirts at that point. Well, the issue is one of fact as to what the sphere is in which a consumer will be confused. If you have Rawlings on your baseball mitt, what if someone else comes out with a baseball bat that says Rawlings, or they're selling baseballs? Those are fact questions. It's a fact question. So here we have a court that got a fundamental issue wrong, which was the strength of our mark, which is one of the primary sleep-craft factors that we look at. Is not likelihood of infringement essentially an indispensable sleep-craft factor? I'm sorry? Likelihood of confusion. Is that an independent sleep-craft factor, or is it the ultimate thing you're trying to prove? Likelihood of confusion is the ultimate thing you're trying to prove. The palming off products in the marketplace. Yes, the sleep-craft factors just aid us in determining, as a matter of fact, whether we've proven it or not. So if you get one of the most important sleep-craft factors wrong, and we all know, well, I think it's highly likely that the trial court got it wrong, don't we need to start over and say, at least do the analysis right, as a matter of fact, as to whether there is a likelihood of confusion? Everything's different. We did have $23 million in sales on the year of infringement. We have a very distinctive mark. Under those circumstances, aren't we entitled to at least go in and say, let's get the factors right, at least. Who owned that mark? Tokidoki, my client. And where'd they get it? They acquired it from Simone Lanyo, who's one of the owners of the company, and who had assigned the mark to the company. And who designed the mark? He did. He did. He assigned it to the company. He designed it, and he assigned it to the company. And when did he make that assignment? When the company was formed. Okay, well, okidoki. I have a minute and 18 seconds, and with court's permission, I'll reserve it to respond to the other appeals. Okidoki. Good morning. Please support James Fidellin for Fortune Dynamic. I'd like to first point out that this was not a prior use case. As the court noted, there was no evidence that no one had used the mark previously, because this was a fraud case. But I would point out that there is evidence of prior use. Mr. Lanyo himself testified that hearts and crossbones were everywhere when he created this mark. But not that hearts and crossbones together were everywhere. Well, he didn't quite clarify that. And there are other witnesses saying hearts and crossbones... Is there any evidence in the record that they were everywhere? Or anywhere? Mr. Lanyo's testimony specifically... I know, but you said he didn't clarify it, so it's not clear. So is there anything that is clear? Yes, we have the testimony of Mr. Bruce Iuliano from San Rio. We have the testimony of Carol Lee, both of whom said they had seen hearts and crossbones together. We have Mr. Ivan Arnold's testimony that he was aware of similar... Before Tokidoki Friday. I don't know that it was before, because as I said, this was not... Well, it's not before. It's kind of irrelevant. Well, it's not a prior use case. You can lose distinctiveness by the mark becoming commonplace, even if it was unique at the moment of creation. If it's being used by the world to where people don't identify that mark any longer with Tokidoki, or if they ever identified it with Tokidoki, that also... What do you mean when you say it's a fraud case? I mean, there is a fraud component, which is the cancellation issue, but it's not relevant to anything else, is it? Well, there is a couple. I mean, it's a case that pervades with fraud. Not only was it the cancellation, but there was a misrepresentation of the copyright. And there was even the trademark that was sued on. The trademark that was sued on was... A misrepresentation of the copyright is a little bizarre. They gave you the copyright number. All you had to do was look it up. Well, that's, in fact, incorrect, because when you look it up, you don't get the copyrighted materials like you do with the trademark materials. But I saw it. Didn't it say catalog? It was a very unclear registration. So, yes, it said catalog on it. Okay. The... Getting back to the trademark that was sued on, Tokidoki had a trademark not only for the heart and crossbones, but for the heart and crossbones with the word Tokidoki. And that's the mark they regularly used. We're not claiming that when you put Tokidoki next to a heart and crossbones. In fact, this is commonplace. It is this mark of solely a heart and crossbones that is commonplace. There were testimony by a number of witnesses about heart and crossbones. In fact, Mr. Lino testified about how he, every couple of months, went on to... I looked at the catalog, and I see the heart and crossbones. I don't see anything where it says Tokidoki on it. So why are you saying that? I see the catalog. It has a belt, and it has some kind of... I mean, it has a pendant of some kind. It has some kind of a hat. And none of it says Tokidoki next to the sign. In those designs, there's typically other things besides the heart and crossbones. We're talking about a situation when you saw the heart and crossbones. There is a hat and a T-shirt. I don't see anything other than the heart and crossbones. I'm looking at the pictures in the catalog. I'm not sure which items you're looking at. They typically have other designs with them in the catalog. That's not what I saw. Okay. Well, I know there's a hat. There's a T-shirt, both of which had very low... I think it was 1% or 2% of Tokidoki sales. There is a belt that was also a very low-selling item, which is also a different category or class of item than the one we're dealing with here. There also was no evidence... You've been ramping up here for about four minutes, and you've said at least five things that are not true, which is not a good way to begin, so let's do better. All right. The... Oh, the evidence of actual confusion also. We have Ms. Lee's testimony that they cite to. She isn't saying that it was a Tokidoki. I'm not sure that it's a Tokidoki shoe. She's saying it's not sure if it's a fortune shoe. There was a similar shoe put out by Punk Rose. So to say that that is evidence of actual confusion is, again, a misstatement. The only evidence in this case of likelihood of... Yes, we have the Sleekcraft factors. We've addressed them in the brief. I'm not going to repeat them here. But I think it's important to note the only actual evidence that was put forth of likelihood of confusion was the survey by Dr. Isaacson, which the Court rejected. Well, what about the notion that actual confusion is one of eight Sleekcraft factors? Correct. Let's assume they just didn't prove that. What about the other seven? I'm sorry. Let's assume they didn't prove that, that the district judge essentially rejected what Professor Isaacson said, and fine. So we're going to say there's no actual evidence of confusion or evidence of actual confusion. But what about the other seven Sleekcraft factors? Well, I mean, there is a similarity to the mark. I think the Court found there was evidence related to the strength of the mark, that it was not a strong mark. It certainly had no secondary meaning. Well, suppose he was right and that was incorrect. At least the legal way it was found was incorrect. If we assume that the judge was incorrect and the mark was strong, that still is not enough by itself to evidence a likelihood of confusion. It needs more. That's why there are all the Sleekcraft factors. Well, if you have exactly the same mark, and let's assume it's a distinctive mark and it's on clothing, although not the same clothing, and you say it's only a little bit the same clothing and it's in different markets, what do we do with that? Do we decide it at that point? Assuming that we think the strength of the mark decision is wrong, or do we send it back to the district court? I think that has to go back to the district court for determination on the strength of the mark. But, again, I'm not sure that we even need to get to that because I'm not sure the strength of the mark by itself is a determining factor. That's why there are multiple Sleekcraft factors. That's why I just answered the question. If we thought the strength of the mark was wrong. You're right. If we thought that was wrong and that was the determining factor, then, yes, I think it needs to go back. But if, in fact, we got that wrong, the other Sleekcraft factors mitigate against finding of confusion, there's no need to send it back. And as the court pointed out, the proximity of goods, for example. Entirely different channels of distribution. There's no evidence of any overlap with consumers. One's high-end, one's low-end. One's in Marshalls, one's in Nordstrom. So that factor also. We have different consumers. That mitigates against finding of confusion. There is no evidence of any actual confusion, which is another Sleekcraft factor. The only two that they have, the only one that they really have is similar in marks. Yes, the heart and crossbones together look like the other set of heart and crossbones together. But that in and of itself is not enough to create confusion. Even if you have the fact that it's a strong mark, which we dispute, again, it's not enough to create confusion. This is the consumers going out there and buying the goods. Is a consumer that's going to walk into Nordstrom and see Tokidoki, or walk into a Macy's or something and see Tokidoki or the sports sacks store, going to then walk into Burlington Coat Factory and see the shoes that Fortune produced and say, oh, I guess those are Tokidoki shoes. In fact, Mr. Lino, I believe it was, or one of the Tokidoki principals testified that they were in Hawaii. They immediately knew that that was not a Tokidoki product. But they were the owners of the company. It is a little hard to believe that a woman shopping, or worse, a man shopping for women's shoes, for his wife or whatever, would see heart and crossbones on shoes and make a distinction between Nordstrom's and even Neiman Marcus or Macy's. I don't know where you're drawing the line in the retail industry, but if they're using the same logo, in effect, on the shoe, then I think you have a tough argument to say that that wouldn't be a confusion. Now, maybe when you separate the products from a T-shirt or whatever to shoes, maybe so. But if you're trying to argue to us that shoe-on-shoe usage of this mark, weak or not, that there wouldn't be a confusion, I find that a hard one to accept. I think the other thing you have to look at is the testimony trial about hang tags. Tokidoki's goods also had a hang tag on them that had the name Tokidoki on the hang tag. These shoes did not have a hang tag that said Tokidoki. In fact, there was a testimony by the witness who made the scrubs, I can't recall the witness's name, about how she immediately saw those hang tags and knew what was Tokidoki by the hang tags. As for shopping, I mean, again, there is no evidence that I know that Tokidoki put in to say that we have the same shoppers going to the same stores. I look at my wife's bills. I see a difference in stores where shopping occurs, too, based on the credit card bills we get. So it's only a personal experience. But the bottom line is that we have to look at all of the sleep craft factors. We have to look at the overall situation. Even if the court got strength of mark wrong, which I think there's evidence in the record that shows. But what's our standard of review here? Do we? If the district court finds, goes through the sleep craft factors, do we do it to no more or what do we do after that? This is where our summary judgment, right? No, this is after trial. After trial, that's right. Okay. Sorry. So what is our standard? Well, we have the factual findings of the court below. So we have to use those and those have to be looked at for clear error. So even if it were a no vote. Were those drafted by the district court, by the way? Pardon? Were those drafted by the district court? No, they were approved by the district court after considering objections and comments by the other side. So in other words, you drafted them. I mean, I don't mean you, but your... My office drafted them. That is correct, yes. So again, if we go back to the issue of, I assume we're talking now about the common law trademark issue and not the registered trademark. If we go back to the common law trademark and talk about the sleep craft factors and looking at these, we also have to consider the... Apologize, I just lost my thought there. Looking at the trademark... What did the judge say when he ruled from the bench? No, she did not, Your Honor. She did not. Judge Fisher took it under submission and in fact, was several months after trial before the findings of fact and conclusions of law were issued. Well, she... In fact, it was six months later. Well, she just took it under submission? Yes. And that was it. But she must have notified somewhere along the line who won, who lost. We had post-trial briefing and then there was a minute order issued, a brief order issued, which instructed, I believe it was, our side to prepare the findings of fact and conclusions of law. I don't have that order in the top of my head. I don't remember exactly what the wording was in the order. If we thought that the... Given that this was after trial and we're viewing for clear error, if we thought that the... There was a clear error with respect to the distinctiveness of the mark. Isn't that not enough to reverse and... No, because... ...for new findings? I think... If there is a clear error, let's assume we thought there was at least one clear error. Then what do we do at that point? We have to look at the totality of the findings of the court. And is the fact that one finding is wrong... But if the finder of fact made one clear error, then we're going to redo it? Then we're not reviewing for clear error anymore. We're making it up ourselves. Well, the question is whether that clear error is enough to overcome the other factors that the judge did not get wrong in analyzing them in light of these sleep-craft factors and the confusion issues. I'd like to move on real briefly, if I could, to the... Actually, if I would, I'd like to reserve the balance of the time for rebuttal with respect to our appeal. In my view, this court is not the proper body in the first instance to re-evaluate the sleep-craft factors if there has been a clear error in one of them. Here's what the district court said... Well, where's the clear error? The district court said, on strength of the mark, as a commonplace mark in a crowded field, the heart above crossbones mark is weak. That, in my view, is clear error. The only supporting evidence... Why is that clear error? Yes, the only supporting evidence is our policing letters sent out to 35 people we were trying to shut down who were infringing our mark. Policing efforts are required. We're out there policing our mark. That can't be the evidence relied upon to prove that our mark is weak, that we're actually out there trying to enforce our mark. So if that is in error, and we contend it is, the sphere of likely confusion, whether it applies from handbags to belts to other products... Let's see, I'm looking for a copy of your letter. What does that letter say? The cease and desist letters? Yeah. They basically say, we own this mark, you're putting out a product that has an infringing design, and we demand that you cease and desist. Did you have your copyright at that time? We had a copyright and trademark registration. And what product? Well, the trademark registration involved products that we were not, frankly, making at the time. It was overbroad. But we were putting out hats, t-shirts, belts, among other things, and shoes. And whether or not one has a federal registration for a trademark is not the test. One gains trademark rights through use in commerce, and the evidence is undisputed that we were using it in commerce with respect to these other products. Are you going to argue at all about the fees or not? Well, if given the chance, I will. I think that the district court did not abuse its discretion in refusing to award fees to Fortune Dynamic. There's substantial evidence that demonstrates this is not an exceptional trademark case. In fact, but for the result, this appears to be a routine trademark enforcement action. We created the mark. We were the first to use it in commerce. What about on the copyright issue? Pardon me? What about on the copyright issue? On copyright, there is substantial evidence to support the district court's determination that the purposes of the Copyright Act would not be fostered by an award of attorney's fees here. Again, but for the result, this appears to be a routine enforcement action. In the fashion industry, every defendant claims that he independently conceived the design. The fact that this is the one case in a hundred where the trier fact believes, oh yeah, they never saw your heart and crossbones. They came up with it themselves. That doesn't mean this wasn't a perfectly proper case when brought. After all, my client came up with the design. No one else was shown to have independently come up with the design other than these people years after we had it. Our design was out there in the marketplace, so it was available, which is one of the elements of copyright infringement. And there is no reason to discourage a copyright owner under these circumstances from bringing an action by penalizing that copyright owner where it turns out that this is the one case in a hundred or maybe in a thousand. Well, how do we factor in the district court findings with respect to the misrepresentations on the copyright? And also, do we weigh at all the notions that the district court's findings with respect to the trademark registration find that there was fraud on the office? Well, I don't think that the district court's findings of fraud on the trademark office... I'm assuming you dispute that. But assume since the district court found, and unless we reject it, the record is both a negative finding against your client, both on trademark registration and on copyright. In evaluating the fees, what weight should those be given? Very little. In the trademark context, it's not necessary to have a registration to own the mark or to sue. So it was still a valid case despite those issues in the case. What about copyright? On copyright, one owns the copyright in the design the moment one creates it. A registration is necessary in order to sue on that design, but it doesn't give ownership. It just is a declaration that one owns the design and gives the person the right to sue. Just following the logic, at least under copyright, without that, you should have not been able to bring the suit. They would have not been put to the expense of defending against a bogus copyright claim. Putting it in an unfriendly way, but we're talking about fees after a bench trial judgment. Let me address just that. Because I know we're over time. This whole issue of the assignment, in my view, is a tempest in a teapot. That's the basis on which you found it. I'm just trying to figure out how we weigh it. If you want to fight the finding, that's a separate issue. I want to say one thing, which is basically that Simone Lanio is the man who originally created the design. He's an owner and an officer of Tokidoki. He's right there at the trial. Whether or not he had assigned it earlier, he could get a piece of paper out at the trial itself and say, I hereby assign. That would have been then, not when you brought the lawsuit. Okay. But it would have resolved the issue. All right. Thank you. Thank you. Thank you. I think the court brought up a point that needs to be addressed, and that is this issue of whether or not the failure to have a registered copyright could be corrected. And the answer to that, as the court pointed out earlier, is the registration was for the catalog. Mr. Lanio did not own the catalog. The suit was on the heart and crossbones, which Mr. Lanio owned. But even if he had assigned it at trial, it still would be unregistered, and there would be no basis to bring suit on that unregistered copyright. Yes, but what the district judge found was, well, that's all true, but it wasn't unreasonable for them to think otherwise. Well, I think that's a contradiction between the findings of the motion for attorney's fees and after trial. Because in the findings after trial, Well, that's frankly why I asked you who drafted those, because one has the overall sense that Judge Fischer wasn't awfully committed to those findings. Well, Judge Fischer actually made some changes to those findings before she signed them. So you can see that in some of the typefaces on there. But Judge Fischer did find that in the trial findings that Mr. Lanio was not the author of Tokidoki's fall 2005 catalog. He had no assignable or transferable property interest in the catalog, and therefore could not assign or transfer any rights to Tokidoki. So if that's the copyright being sued on, it couldn't have been corrected at trial because Mr. Lanio couldn't have assigned it. What he owned was the Hartman Crossbones copyright. An assignment of that would not effectuate a registration of the Hartman Crossbones individually. So based upon that, there was no basis for this suit to begin with. And I think we need to look at the Mattel case that we've cited. It talks about the issue of deterrence. And that was, with deterrence, the issue is whether the defense would serve the deterrent value. And when someone brings a copyright claim on an unregistered mark and does, even though the registration did say catalog, makes the misrepresentations that were made throughout this case, both in declarations of summary judgment that it was for the Hartman Crossbones, at trial it was for the Hartman Crossbones. Remember in the record, there was an attempt to find, and the assignment pops up in the middle of trial that supposedly was executed years before, and the exhibit has the copyright registration mark on it, which didn't occur until several years after the date of the purported assignment. So even, there's this effort to try to cover up and mislead everything. So this is a case that screens out for deterrence on the copyright issue as a basis for awarding fees. Motivation, I think the motivation, the amount of cease and desist letters, demands for money that evidence, show that this was a motivation to try to bring leverage, even on the trademark claim, to assert a false copyright claim. Degree of success. I think that's all in your briefs. Yes, it is. So I think that the other issue on the fees was the summary judgment that the court addressed. As this court has pointed out in numerous cases, summary judgment is a highly factual issue. The probability of a case like this getting by summary judgment is very high. While summary judgment needs to be looked at to say that summary judgment by itself. You've covered all that. Okay. Yeah, you don't need to do any more. Very well, thank you. All right, matters submitted. Thank you. Thank you. We'll pick up now on Thomas v. Federal Express.
judges: Pregerson, Fisher, Berzon